FILED
CHARLOTTE, NC
OCT 22 2019
US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Docket No.: 3:19Cr327 |
| v. ) | |
| ) | **BILL OF INFORMATION** |
| TONY GARRETT TAYLOR ) | Violations: 18 U.S.C. § 1349 |
| ) | 26 U.S.C. § 7201 |

THE UNITED STATES ATTORNEY CHARGES:

At the specified time and at all relevant times:

### Introduction

1. From at least in or about June 2015 until at least in or about December 2017, the defendant, TONY GARRETT TAYLOR, conspired with Jerry Lewis Taylor and others, known and unknown to the United States Attorney, in a scheme to defraud the North Carolina Medicaid Program ("Medicaid") of millions of dollars by submitting false and fraudulent reimbursement claims for non-existent services as well as submitting claims that misrepresented the services actually provided to Medicaid beneficiaries in order to earn greater reimbursement than was owed.

### Individuals and Entities

2. Defendant TONY GARRETT TAYLOR ("TAYLOR") was at times relevant to this Information, a resident of Charlotte, North Carolina, and elsewhere.

3. Jerry Lewis Taylor ("Jerry"), charged elsewhere, is TAYLOR's brother, and was at times relevant to this Information, a resident of Union County, North Carolina and elsewhere.

4. TAYLOR, together with Jerry, owned and operated a series of entities that held themselves out as providers of outpatient behavioral health services to at-risk youth in North Carolina and elsewhere. TAYLOR was the organizer and leader of the Medicaid fraud conspiracy and was responsible for, among other things, recruiting other participants in the scheme and obtaining prospective patient lists containing identifying information for Medicaid beneficiaries. T.G.T. was the organizer and leader of the Medicaid fraud conspiracy. The entities owned and operated by TAYLOR and/or Jerry included, but were not limited to the following (referred to collectively herein as the "Taylor Businesses"):

    a. Taylor Behavioral Health Center, LLC ("TBHC"), was owned by TAYLOR and operated by TAYLOR and Jerry during times relevant to this Information. TBHC was headquartered in Monroe, North Carolina, and operated in Monroe and elsewhere. TAYLOR caused TBHC to be enrolled as a Medicaid billing provider beginning in at least June 2015.

b. Options Driven LLC ("Options Driven"), was owned by Jerry and operated by TAYLOR and Jerry during times relevant to this Information. Options Driven was headquartered in Monroe, North Carolina, and operated in Monroe and elsewhere. TAYLOR and Jerry caused Options Driven to be enrolled as a Medicaid billing provider beginning in at least August 2016.

c. Design for Change LLC ("DFC"), was owned by T.M.V. and operated by TAYLOR and Jerry during times relevant to this Information. DFC was headquartered in Raleigh, North Carolina, and operated in Raleigh and elsewhere. T.M.V. caused DFC to be enrolled as a Medicaid billing provider at TAYLOR's direction beginning in at least September 2016.

d. SHG Consultants, Inc. ("SHG"), was owned by M.H. and operated by TAYLOR and Jerry during times relevant to this Information. SHG was headquartered in Gastonia, North Carolina, and operated in Gastonia and elsewhere. M.H. caused SHG to be enrolled as a Medicaid billing provider beginning in at least February 2017.

5. Ameera Ali, charged elsewhere, owned and operated Accuracy Billing Agency, Inc. ("Accuracy") in Columbus, Ohio, and elsewhere, from in or about 2007 through at least 2018. Ali, through Accuracy, provided consulting and billing services to mental health companies operating in North Carolina and elsewhere, including to companies owned and operated by TAYLOR and Jerry, including the Taylor Businesses. Ali was introduced to TAYLOR by another individual, the identity of whom is known to the United States Attorney, for whom Ali submitted fraudulent claims to Medicaid.

6. Devon Rambert-Hairston, charged elsewhere, was a resident of Huntersville, North Carolina. From September 2010 through at least August 2018, Rambert-Hairston was licensed as a nurse practitioner through the North Carolina Board of Nursing. Beginning in at least October 2011, Rambert-Hairston was enrolled as a rendering provider with the North Carolina Medicaid Program.

7. Christine Yvette Knight., charged elsewhere, operated Connect and Move Staffing LLC ("Connect and Move") in Clermont, Florida, from in or about October 2015 through at least in or about September 2017. Knight, through Connect and Move, prepared treatment notes and prepared billing spreadsheets for companies owned and operated by TAYLOR and Jerry, including the Taylor Businesses, that contained false and fraudulent information.

8. J.B., a co-conspirator unindicted herein was a resident of Youngsville, North Carolina during times relevant to this Information. From at least October 2004 through the date of this Information, J.B. was licensed as a marriage and family therapist through the North Carolina Marriage and Family Licensure Board.

## The Medicaid Program

9. The North Carolina Medicaid Program is a state-administered program aided by federal funds.

   a. Medicaid helps pay for reasonable and medically necessary services for qualifying, enrolled individuals and their families, referred to herein as "beneficiaries." Covered services include mental and behavioral health services. The North Carolina Medicaid Program is administered by the Division of Health Benefits, North Carolina Department of Health and Human Services (referred to herein as "DHB," formerly known during times relevant to this Information as the Division of Medical Assistance "DMA"), which oversees mental health providers through the state who receive payments from Medicaid. The North Carolina Medicaid system includes both traditional Medicaid and the North Carolina Health Choice for Children insurance program ("NCHC"). (The North Carolina Medicaid Program, DHB, and NCHC are collectively referred to herein as "Medicaid.")

   b. If qualified, an individual can enroll as a Medicaid beneficiary. At the time of enrollment, a beneficiary receives a unique alphanumeric code that is issued by the program, known as a Medicaid Identification Number. Each beneficiary can be identified by reference to their unique identification number and may use their Medicaid Identification Number to receive covered services.

   c. Medicaid beneficiaries receive services from practitioners (referred to herein as "rendering providers") and companies (referred to herein as "billing providers"). Once a rendering provider or billing provider enrolls with Medicaid, the program issues a unique number to the provider, known as the "provider number." Rendering and billing providers must also obtain a federal identification number, known as a National Provider Identifier or "NPI" number. All Medicaid rendering and billing providers must certify that they will only bill the government for services they actually render.

   d. After a rendering provider renders a covered medical service to a Medicaid beneficiary, the billing provider may bill Medicaid for the reasonable and necessary costs of the service. To bill Medicaid, providers generally send an electronic claim to the program. In North Carolina, electronic claims are submitted through Medicaid's online provider portal, called "NCTracks." Providers may also hire third-party billing companies or contractors to perform the task of submitting claims to Medicaid for payment.

   e. Medicaid providers are permitted to bill for outpatient health services only where certain objective criteria have been met. Medicaid requires providers to adhere to Current Procedural Terminology ("CPT") codes to determine whether these objective criteria have been met prior to billing Medicaid for those services. Under Medicaid regulations, certain procedures, such as medical evaluation and management services (for example, CPT codes 99205 and 99215, among others) can only be provided by specified medical professionals, such as a physician, nurse practitioner, or physician's assistant.

f. The claim transmission generally includes, but is not limited to, the date of the alleged service, the Medicaid Identification Number of the beneficiary, the nature of the service rendered (including the CPT code for the service), and the provider or federally-issued NPI number. The electronic claim is generally all that is required to receive payment from Medicaid.

g. While Medicaid may reject a claim if, for example, the provider or beneficiary is not enrolled, Medicaid typically presumes the truth of each claim and generally pays providers for the services that they bill. In other words, Medicaid entrusts its providers to submit claims only for services that they actually perform.

10. Medicaid is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

### The Health Care Fraud Conspiracy

11. Beginning at least as early as June 2015, TAYLOR and Jerry conspired with each other and with others known and unknown to the United States Attorney in a scheme to defraud Medicaid by seeking and obtaining payment from Medicaid for claims for medical services purportedly provided to Medicaid beneficiaries which were false and fraudulent in one or more material respect.

12. Specifically, TAYLOR, Jerry, and others conspired to submit claims to Medicaid for fictitious services that were never provided to or received by the beneficiaries.

a. For example, TAYLOR obtained "Marketing Lead" spreadsheets from Ali that contained identifying information for eligible Medicaid beneficiaries, such as Medicaid Identification Numbers, dates of birth, and diagnosis codes indicating the beneficiaries' purportedly diagnosed mental health condition.

b. TAYLOR forwarded the beneficiary information contained in the "Marketing Lead" spreadsheets obtained from Ali, as well as beneficiary information obtained by TAYLOR from other sources, to other members of the conspiracy, including Ali and, at times, Knight, who used the beneficiary information to prepare billing spreadsheets listing the beneficiaries' information and which included fraudulent dates of service on which the beneficiaries purportedly received services.

c. TAYLOR and Jerry instructed Ali, Knight, and others, to back-date the services to appear as if they had occurred up to 90 days prior to the date the claims were submitted to Medicaid, a practice known as "back-billing." In many instances, billing spreadsheets prepared or caused to be prepared by TAYLOR and Jerry contained back-billed purported service dates that pre-dated the date TAYLOR identified beneficiaries as possible recipients of services—the earliest date that services could have been legitimately provided.

d. In reality, many of the claimed service dates contained in the billing spreadsheets were fictitious and in several instances, the beneficiaries never received any

4

services at all from TBHC or any of the other entities owned or operated by TAYLOR and/or Jerry.

   e. TAYLOR provided the billing spreadsheets prepared by Knight and others to Ali, who submitted the information contained in the spreadsheets to Medicaid for reimbursement through Medicaid's online claims submission portal, NCTracks, at TAYLOR's direction.

  13. TAYLOR and Jerry also conspired with each other and with others to submit claims to Medicaid that, to the extent any services were actually provided to beneficiaries, misrepresented the nature of the services rendered in order to earn more in Medicaid reimbursements than was actually owed, a practice known as "up-coding."

   a. In furtherance of the conspiracy, Ali recruited J.B. to provide behavioral health treatment services, or the appearance of behavioral health treatment services, to Medicaid beneficiaries by the Taylor Businesses.

   b. Also in furtherance of the conspiracy, TAYLOR recruited Rambert-Hairston to serve as the medical director of TBHC beginning at least as early as July 2015. In that role, TAYLOR asked Rambert-Hairston to review and sign-off on progress notes reflecting behavioral health services ostensibly provided by TBHC to Medicaid beneficiaries. Rambert-Hairston did not provide any behavioral health or medical services to these beneficiaries and only rarely interacted with any beneficiaries at all.

   c. The progress notes reviewed and signed by Rambert-Hairston indicated the beneficiaries had been seen by J.B.

   d. TAYLOR and Jerry caused the submission of claims for expensive medical evaluation and management services to Medicaid, falsely claiming the services had been provided by Rambert-Hairston and other medical professionals. In reality, many of the beneficiaries never received services of any kind from Rambert-Hairston, TBHC, or any of the other Taylor Businesses. To the extent some beneficiaries did receive services, they were typically provided by J.B., who, as a licensed marriage and family therapist, was not appropriately credentialed to provide medical services and, therefore, was precluded by Medicaid regulations from rendering the medical evaluation and management services claimed.

   e. TAYLOR knew, based on information provided by Ali, that J.B. was precluded from providing the medical evaluation and management services under applicable Medicaid regulations. Nonetheless, TAYLOR and Jerry caused claims to be submitted to Medicaid for these medical services on behalf of the Taylor Businesses, falsely claiming they had been rendered by Rambert-Hairston and other qualified medical professionals, rather than J.B.

  14. After TBHC was placed on pre-payment review by DHB on or about August 17, 2016 for suspicion of fraudulent activity following an evaluation of claims, Ali, J.B., Knight., and others assisted TAYLOR and Jerry in continuing the fraudulent scheme in the same manner described above through a number of successive entities, including Options Driven, SHG, and

5

DFC. For example, in or around August 2016, Rambert-Hairston agreed to allow TAYLOR to submit Medicaid claims using her NPI number as both the rendering and billing provider until other entities owned or operated by TAYLOR and Jerry could be enrolled as Medicaid providers.

15. It was also a part of the conspiracy that TAYLOR and/or Jerry directed Knight to prepare patient records, including comprehensive clinical assessments ("CCAs"), treatment plans, and progress and service notes, among others, which contained false and fraudulent information, that were required to be kept and maintained by Medicaid outpatient behavioral health service providers, such as the Taylor Businesses.

    a. TAYLOR obtained from J.B. templates for clinical assessments and progress and service notes that corresponded to the purported mental health diagnoses for the juvenile Medicaid beneficiaries the Taylor Businesses claimed to be treating.

    b. At TAYLOR and Jerry's direction, Knight, through Connect and Move, prepared and caused to be prepared false and fraudulent CCAs and progress and service. Knight and her employees prepared several of the fraudulent service and progress notes to correspond to the fraudulent dates of service contained in the claims submissions filed with Medicaid in furtherance of the fraudulent scheme.

16. During the course of the fraudulent scheme, TAYLOR and Jerry caused hundreds of false and fraudulent claims to be submitted to Medicaid for services purportedly provided to Medicaid beneficiaries by the Taylor Businesses. For example:

    a. On or about August 18, 2015, TAYLOR and Jerry caused the submission of claims representing that juvenile beneficiary K.V. received services on 31 separate dates of service from in or about January 2015 to in or about August 2015, falsely and fraudulently claiming K.V. received medical evaluation and management services from Rambert-Hairston on 30 of those dates. K.V. never received any medical evaluation and management services from Rambert-Hairston or anyone qualified to render them. The claims TAYLOR and Jerry caused to be submitted resulted in approximately $4,877 in fraudulent payments from Medicaid.

    b. During the course of the fraudulent scheme, TAYLOR and Jerry caused the submission of several false claims to Medicaid for medical evaluation and management services purportedly provided by Rambert-Hairston to more than 50 beneficiaries, all occurring on September 1, 2015. The claims asserted that each of the 50 beneficiaries received one-on-one evaluation and management services lasting 40 minutes or more, billed under CPT codes 99205 or 99215. No services were ever provided by Rambert-Hairston in connection with the submitted claims. Moreover, the submitted claims represented services that could not possibly have been provided by any single individual in a given day. As a result of the fraudulent claims submission, Medicaid paid TBHC approximately $33,350.

    c. On or about February 11, 2016 and again on or about January 10, 2017, TAYLOR and Jerry caused the submission of claims falsely representing juvenile beneficiary J.G. received services on a total of 58 separate dates of service from in or about

6

July 2015 to in or about January 2017. J.G. never received any services of any kind from TBHC, Options Driven, or any of the other Taylor Businesses. As a result of the fraudulent claims submission, Medicaid paid two of the Taylor Businesses, TBHC and Options Driven, approximately $8,552.

17. As a result of the fraudulent scheme, TAYLOR, Jerry, and others caused more than $9.4 million in fraudulent claims to be submitted to Medicaid, resulting in approximately $6.1 million in fraudulent payments from Medicaid.

## Tax Fraud

18. TAYLOR derived taxable income from his role in the above-described conspiracy in tax years 2015, 2016, and 2017.

    a. For tax year 2015, TAYLOR failed to file a timely U.S. Individual Income Tax Return Form 1040 and to make any tax payments by April 15, 2016. However, during 2015, TAYLOR received and caused to be deposited approximately $977,852.03 in fraudulent receipts from Medicaid into bank accounts he controlled.

    b. For tax year 2016, TAYLOR failed to file a timely U.S. Individual Income Tax Return Form 1040 and to make any tax payments by April 17, 2017. However, during 2016, TAYLOR received and caused to be deposited approximately $2,480,255.73 in fraudulent receipts from Medicaid into bank accounts he controlled.

    c. For tax year 2017, TAYLOR also failed to file a timely U.S. Individual Income Tax Return Form 1040 and to make any tax payments by April 15, 2018. However, during 2017, TAYLOR deposited approximately $700,835.91 in fraudulent receipts from Medicaid into bank accounts he controlled.

19. TAYLOR took affirmative steps to willfully evade and defeat his income tax obligations for 2015, 2016, and 2017, including diverting fraudulent receipts from Medicaid to nominee entities and individuals and making personal expenditures from business entity accounts TAYLOR controlled.

    a. From in or about July 2015 through in or about March 2016, TAYLOR directed approximately $1,471,467.80 in fraudulent receipts from Medicaid be deposited into a bank account TAYLOR established for an entity he registered as a tax-exempt charitable organization under Title 26, United States Code, Section 501(c)(3).

    b. From in or about September 2016 through in or about February 2017, TAYLOR directed approximately $695,500 in fraudulent receipts from Medicaid be deposited into a bank account controlled by Rambert-Hairston before transferring the funds to accounts controlled by TAYLOR.

    c. From in or about December 2016 through in or about June 2017, TAYLOR directed an additional approximately $615,640.41 in fraudulent receipts from Medicaid be deposited into bank accounts controlled by other co-conspirators before transferring the funds to accounts controlled by TAYLOR. For example:

        i.       Approximately $552,640.41 in fraudulent receipts were deposited into accounts controlled by Jerry before being transferred to TAYLOR during this time period; and

        ii.      Approximately $40,000.00 in fraudulent receipts were deposited into accounts controlled by Knight before being transferred to TAYLOR during this time period.

    d.      TAYLOR made significant personal expenditures from funds derived from the above-described fraudulent scheme in 2015, 2016 and 2017, including the following, among other expenses:

        i.       Approximately $38,408.73 at night clubs in 2015, of which approximately $36,284.70 was made from one or more bank accounts associated with an entity registered as a tax-exempt charitable organization under Title 26, United States Code, Section 501(c)(3);

        ii.      Approximately $131,429.76 at night clubs in 2016, approximately $9,550.61 of which was made from one or more bank accounts associated with an entity registered as a tax-exempt charitable organization under Title 26, United States Code, Section 501(c)(3); and

        iii.     Approximately $60,975.28 at night clubs in 2017.

20.    As a result, TAYLOR had significant income on which a substantial federal income tax was due and owing in tax years 2015, 2016, and 2017.

## COUNT ONE
## 18 U.S.C. § 1349
### (Health Care Fraud Conspiracy)

21. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 17 of this Bill of Information and further alleges that:

22. From at least in or about June 2015 through at least in or about December 2017, in Union County, within the Western District of North Carolina and elsewhere, the defendant,

**TONY GARRETT TAYLOR,**

did knowingly combine, conspire, confederate, and agree with Jerry Lewis Taylor and with other persons, known and unknown to the United States Attorney, to commit an offense against the United States, that is, health care fraud, a violation of Title 18, United States Code, Section 1347.

### Object of the Conspiracy

23. *Health Care Fraud* – It was a part and an object of the conspiracy that TONY GARRETT TAYLOR, Jerry Lewis Taylor, and others known and unknown to the United States Attorney, having devised the above-described scheme and artifice to defraud and to obtain by means of materially false and fraudulent pretenses, representations, and promises, any of the money owned by and under the custody and control of a health care benefit program, as defined in Title 18, United States Code, Section 24, in connection with the delivery of, and payment for, health care benefits, items, and services, by submitting and causing to be submitted false and fraudulent claims to the North Carolina Medical Assistance Program, a violation of Title 18, United States Code, Section 1347.

### Manner and Means

24. The conspirators, including TONY GARRETT TAYLOR, Jerry Lewis Taylor, and others known and unknown to the United States Attorney, carried out the conspiracy through the manner and means described in paragraphs 1 through 17 of this Bill of Information, among others.

All in violation of Title 18, United States Code, Section 1349.

# COUNT TWO
## 26 U.S.C. § 7201
### (Tax Evasion – 2016 Tax Year)

25. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 20 of the Bill of Information, and further alleges that:

26. During the calendar year 2016, defendant **TONY GARRETT TAYLOR**, a resident of Mecklenburg County, North Carolina, received a significant personal income. Upon that taxable income, there was owing to the United States of America a substantial income tax. Well knowing the foregoing facts, and failing to make an income tax return on or before April 17, 2017, as required by law, to any proper officer of the Internal Revenue Service, and pay to the Internal Revenue Service the income tax, defendant **TONY GARRETT TAYLOR**, between in or about January 2016 and in or about the date of this Bill of Information, in the Western District of North Carolina, did willfully attempt to evade and defeat the income tax due and owing by him to the United States of America for the 2016 calendar year by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income by: paying personal expenses out of business bank accounts; diverting gross receipts from the health care fraud conspiracy described herein to various nominee entities and individuals; and other means.

All in violation of Title 26, United States Code, Section 7201.

10

Case 3:19-cr-00327-RJC-DSC   Document 1   Filed 10/22/19   Page 10 of 11

## NOTICE OF FORFEITURE

Notice is hereby given of 18 U.S.C. §§ 982 and 28 U.S.C. § 2461(c). Under § 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The following property so subject to forfeiture in accordance with sections 982 and/or 2461(c):

    a.    All property which constitutes or is derived from proceeds of the violations set forth in Count One of this Bill of Information; and

    b.    If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold do, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment for all currency and monetary instruments which were received during or involved in the crimes alleged in Count One this Bill of Information, including but not limited to the sum of approximately $2,815,325.45.


R. ANDREW MURRAY
UNITED STATES ATTORNEY

_____ AUSA Steven Kaufman
DALLAS J. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

11

Case 3:19-cr-00327-RJC-DSC   Document 1   Filed 10/22/19   Page 11 of 11